IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TRAVIS S. FORD,

      Plaintiff,

v.                                    CV 12-0302 WPL

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

Travis S. Ford filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments on October 16, 2009. (Administrative Record ("A.R.") at 106, 111.) He alleged that he had been disabled since July 31, 2008,[1] due to traumatic brain injury, post-traumatic stress disorder ("PTSD"), Attention-Deficit/Hyperactivity Disorder ("ADHD"), explosive mood disorder, anxiety, Bipolar Disorder, an inability to concentrate, headaches, and chronic knee pain. (A.R. at 66, 138.) Administrative Law Judge ("ALJ") Ann Farris held a hearing on his applications on December 17, 2010. (A.R. at 37.) She determined that Ford was not under a disability as defined by the Social Security Act and therefore not entitled to benefits. (A.R. at 31.) Both applications were denied. (*Id.*) Ford submitted additional evidence to the Appeals Council, but it declined Ford's request for review, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (A.R. at 1-5, 223-26, 337-86.)

---

[1] Ford also applied for DIB and SSI payments in August 2004. (A.R. at 21.) These applications were denied on January 5, 2005. (*Id.*) References made to medical documents dated before July 31, 2008, are done for historical reasons and are not intended to reopen the prior claim. (*Id.*)

Ford sought a review of the SSA's decision (Doc. 1) and filed a motion to reverse and remand for rehearing (Doc. 19). The Commissioner of the SSA ("Commissioner") responded (Doc. 21), and Ford filed a reply (Doc. 22). Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties have consented to have me serve as the presiding judge and enter a final judgment. After having read and carefully considered the entire record and the relevant law, I grant Ford's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See id.* (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfry v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall*, 561 F.3d at 1051-52; 20 C.F.R. §§ 404.1520, 416.920 (2012). If a finding of disability or nondisability is directed at any point,

the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, he is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Ford, age twenty-eight, has worked intermittently as a cook or laborer for the last decade. (A.R. at 149, 178.) Ford's work history indicates that he has been employed off and on during this period. (A.R. at 149.) His last period of employment ended on July 31, 2008, and he last met the insured status requirements for his DIB claim on September 30, 2009. (A.R. at 120, 134.)

A psychologist first diagnosed Ford with cognitive and emotional problems, including ADHD and a mixed personality disorder with antisocial and borderline elements, in 1998. (A.R. at 227-31.) By 2000, a psychiatrist had also diagnosed Ford with intermittent explosive disorder and a depressive disorder. (A.R. 236.) Conditions associated with these diagnoses included poor social perceptiveness and social judgment, anger and aggression, chronic tension, and occasional

suicidal ideation. (A.R. at 230, 235-36.) In a September 2000 evaluation, a psychiatrist assessed Ford's Global Assessment of Functioning ("GAF") score at forty-five.[2] (A.R. at 236.)

Over the next nine years, Ford received mental health treatment in at least three different inpatient facilities due to a suicide attempt, anger management issues, and other unspecified incidents. (A.R. at 288.) He frequently sought mental health treatment on an outpatient basis (*id.*), and he also received treatment for depression and other mental health conditions during periods of incarceration (A.R. at 338, 343-44). At one session in 2004, a social worker assessed Ford's GAF at sixty.[3] (A.R. at 359.) Ford also sought treatment for headaches, dizziness, and pain in his knees during this period. (A.R. at 349, 360-62.)

When applying for DIB and SSI payments in October 2009, Ford reported that he had chosen his last date of employment (July 31, 2008) as his onset date. (A.R. at 138, 145.) He also stated that he was not taking any medication "because they are too expensive." (A.R. at 167.) He claimed that he performed several household chores such as taking out the trash, doing the dishes, and doing the laundry, but his mother reported that the frequency at which he performed these tasks depended on his energy level and his state of mind. (A.R. at 162, 170.)

In January 2010, Harry Burger, D.O., evaluated Ford's medical condition after a referral by the state disability office. (A.R. at 252.) During the evaluation, Ford reported that he suffered several untreated head injuries and seizures as a child and teenager. (*Id.*) Ford also reported post-traumatic stress tied to both the nonlethal shooting of his mother and his time spent in juvenile

---

[2] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.*

[3] A score of sixty indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Am. Psychiatric Ass'n, *supra*, at 34.

detention. (*Id.*) Ford stated that his knee locked up often when he played sports as a teenager and that his knees continued to hurt him. (A.R. at 252, 253.) Dr. Burger observed no physical deformities or fractures in Ford's head, spine, or knees, and he did not find any residual symptoms from earlier head injuries. (A.R. at 254-55.) Other than being slightly nervous, Ford's behavior betrayed no abnormal affect, behavior, or anxiety. (A.R. at 254.) Dr. Burger concluded that Ford was not suffering from any mental or physical disabilities that would prevent him from working for gainful employment. (A.R. at 255.)

Also in January 2010, Juanita C. Ainsley, Psy. D., performed a consultative mental status examination of Ford at the request of the SSA. (A.R. at 287.) During the examination, Dr. Ainsley observed that Ford was alert and attentive but also anxious and angry. (A.R. at 289.) His interactions with her exhibited social awkwardness and resentment. (*Id.*) She made note of his defensive and reactive stance towards others, observing that he struggled to take responsibility for or understand the consequences of his behavior. (*Id.*) She also found Ford to be of low to average intelligence and lacking the capacity for useful insight, noting that he struggled to sequence events correctly without his mother's help and that he was difficult to understand. (*Id.*) She further stated that Ford struggled with executive functioning, planning ahead, and self-restraint. (*Id.*) Finally, she noted that Ford suffered from manic symptoms, including "racing thoughts, labile moods, feeling unduly powerful, impulsive spending and [a] history of impulsive use of drugs." (A.R. at 290.)

Ford reported to Dr. Ainsley that he was not taking any medications, stating that he was supposed to be taking Depakote, Prozac, and trazedone but that he could not afford them. (A.R. at 288.) He also reported that he had previously used methamphetamine and marijuana but that he had quit using both substances by November 2009. (A.R. at 288-89.)

Dr. Ainsley ultimately diagnosed Ford with intermittent explosive disorder, substance abuse, Bipolar Disorder, and mixed personality disorder with paranoid and antisocial traits. (A.R. at 290.) She also observed some symptoms of PTSD, but she did not diagnose him with that disorder. (*Id.*) She assessed Ford's GAF at forty to forty-five. (*Id.*) Based on this assessment, Dr. Ainsley stated that Ford would require repetition and explanation to learn instructions in the workplace, that he would not be able to get along with others or accept supervision, that he would require repetitive and solitary work, and that he would not be able to manage his money. (A.R. at 291.) She concluded by describing his prognosis as poor. (*Id.*)

Nancy Morrison, M.D., a state disability department physician, completed a Psychiatric Review Technique Form and a Residual Functional Capacity Assessment with respect to Ford in February 2010. (A.R. at 256, 270.) After reviewing Ford's submissions and the records of the previous month's examinations, Dr. Morrison concluded that Ford had mild restrictions of daily living activities, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no extended episodes of decompensation. (A.R. at 266, 272-73.) She questioned Dr. Ainsley's diagnosis of Bipolar Disorder, stating that Ford's symptoms could be tied to substance abuse. (A.R. at 273.) She also stated that some of Ford's activities and hobbies – using a computer, constructing model cars, and completing his paperwork on his own – suggested a greater capacity to concentrate and persist at tasks than Ford was reporting. (*Id.*) Dr. Morrison reported that Ford could "understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, and respond appropriately to changes in a routine work setting." (*Id.*) She also suggested a work setting that would limit his exposure to coworkers or the public. (*Id.*)

Following the RFC Assessment, the SSA determined that Ford was not disabled for the purposes of receiving DIB or SSI payments. (A.R. at 57, 58.) After Ford requested reconsideration, SSA physicians reviewed his updated records but reached the same conclusion. (A.R. at 56-60, 279-80.)

Ford sought treatment for sharp back pains at a hospital emergency room in July 2010. (A.R. at 322.) After performing a CT scan on his abdomen and pelvis, medical personnel diagnosed Ford with a back strain. (A.R. at 323-27.) The doctor did not consider the injury to be traumatic. (A.R. at 327.) Three months later, Ford again appeared at the emergency room with complaints of back pain lasting for the past week. (A.R. at 317.) Ford was ultimately diagnosed with a urinary tract infection. (A.R. at 320.) Two other documents from the same facility discuss a back strain, but the date of those diagnoses is unclear. (A.R. at 329-32; A.R. at 333-36.) However, the print-out dates for those documents differ from the dates on the other two records, and the treating physicians and account numbers differ from those listed for the other visits, implying that these were separate examinations. (*See* A.R. at 317, 322, 329, 333.)

### HEARING TESTIMONY

On December 17, 2010, the ALJ held an in-person hearing at which both Ford and a vocational expert ("VE") testified. (A.R. at 39.) Ford was represented by Vanessa Boushee, who is incorrectly identified in the transcript as an attorney. (*See* A.R. at 39, 105.) Prior to testimony, Boushee stated that she had a new report from Presbyterian Medical Services ("PMS"), and the ALJ accepted treatment notes into the record at that time. (A.R. at 39-40.)

Upon questioning, Ford stated that he left his last job in July 2008 due to an ankle injury and that his anger issues, along with his chronic back, knee, and head pains, prevent him from returning to work. (A.R. at 42-43.) He also testified that he struggles to pay attention or recall

details and that even a "slight tone of voice" could trigger his anger issues. (A.R. at 45, 48-49.) Ford revealed that in order to deal with his anger and substance abuse problems, he had been attending weekly counseling sessions in the period leading up to the hearing. (A.R. at 42.) Additionally, on prompting from his representative, Ford stated that his knee and back issues were continuing and that he had recently been to the emergency room twice for the pain. (A.R. at 50.) Before the hearing ended, the ALJ asked Ford's representative to send in records from those emergency room visits. (A.R. at 55.)

After the ALJ and Ford's representative questioned Ford, the ALJ spoke to the VE, Daniel V. Moriarty, regarding Ford's past work history and his ability to work in the future. (A.R. at 51-52.) The ALJ asked the VE if "a person of the same age, education and work history as [Ford], [having] no exertional limitations" but needing as little interaction as possible with coworkers or the public, would be to perform any of Ford's past jobs, and the VE answered in the negative. (A.R. at 52-53.) However, when the ALJ asked the VE if such a person could perform any jobs in the regional and national economy, the ALJ cited work as a cleaner, a laundry folder, and a bench hand as possibilities. (A.R. at 53.) The VE also said that such a person could still perform such work if he were limited to simple, routine tasks. (A.R. at 53-54.) Ford stated that he could "possibly" work such jobs if his doctors allowed him to do so, but he voiced concern that a pinched nerve in his back would prevent him from lifting objects weighing over five pounds. (A.R. at 54-55.)

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Ford's claim pursuant to the five-step sequential evaluation process. (A.R. at 22-23.) She first determined that Ford had not engaged in substantial gainful activity since his onset date. (A.R. at 23.) She then found that Ford suffers from four severe impairments:

Bipolar Disorder, an intermittent explosive disorder, substance abuse, and a mixed personality disorder with paranoid and anti-social traits. (A.R. at 24.) Next, the ALJ concluded that Ford did not have an impairment or combination of impairments which met the criteria of listed impairments under Appendix 1 of the SSA's Regulations, so she proceeded to evaluate his RFC. (*Id.*)

In reviewing the record, the ALJ particularly focused on the diagnoses and impressions of Dr. Burger and Dr. Ainsley and gave significant weight to their opinions. (A.R. at 29.) By contrast, she found that Ford's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible in light of his own testimony and the opinions of Dr. Burger and Dr. Ainsley. (A.R. at 25.) For example, she said that despite what one might expect from someone with his alleged symptoms, Ford is able to perform some chores without much difficulty, visit the park and mall frequently, drive a car, lift fifty pounds, and play games on his computer. (A.R. at 28.) Further, although Ford complained to several people that he could not afford medical care or medication, the ALJ observed that Ford had made no effort to obtain indigent medical care. (*Id.*) This observation, along with Ford's minimal medical treatment and lack of regular medication, led the ALJ to believe that "[Ford's] complaints of disabling symptoms are not especially bothersome." (*Id.*)

Based on these findings, the ALJ found that Ford has the RFC for a full range of work at all exertional levels, provided that the work is primarily solitary, requiring little interaction with coworkers or the public, and limited to simple, routine tasks. (A.R. at 25.) Relying on this RFC and the testimony of the VE, the ALJ concluded that while Ford could not perform any of his past relevant work, he is able to perform other jobs that exist in significant numbers in the

national economy. (A.R. at 29.) On that basis, the ALJ determined that Ford was not disabled under the meaning of the Social Security Act and not entitled to benefits. (A.R. at 30.)

Ford appealed the decision (A.R. at 17), and he submitted other records pertaining to medical and psychiatric treatment over the past decade to the Appeals Council through a new attorney. (A.R. at 5, 16.) The Council found that the additional information did not justify a review of the ALJ's decision, thus rendering the ALJ's decision the final decision of the Commissioner. (A.R. at 1.)

## DISCUSSION

Ford raises multiple challenges to the ALJ's decision to deny benefits. Although several of the alleged errors could be construed as affecting multiple steps in the sequential evaluation process, many such claims center on the RFC analysis in the fourth step. Because I find dispositive error at or before that step, I need not reach Ford's claim of error at step five.[4]

## I.    Development of the Record

Ford alleges that the ALJ failed to appropriately develop the record in three ways. First, he alleges that the ALJ erred in failing to provide Dr. Ainsley with background documents relating to Ford's previous mental health treatment. (Doc. 19 at 13.) Second, he contends that the ALJ should have acquired records of Ford's weekly counseling sessions at PMS for the weeks

---

[4] Ford argues at step five that the ALJ's hypothetical questions to the VE failed to incorporate all of the impairments and limitations that the ALJ recognized. This argument is mooted by the need to remand this matter to the ALJ for further consideration of the impairments and limitations at issue. *See Krauser v. Astrue*, 638 F.3d 1324, 1333 (10th Cir. 2011). However, although I do not decide the matter, it appears that the VE's testimony was indeed based on incomplete hypothetical questions. *See Allen v. Barnhart*, 357 F.3d 1140, 1143 (10th Cir. 2004); *see also Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000) (finding a hypothetical question to a VE sufficient "in that it contained all of the limitations found to exist by the ALJ"). On remand, the ALJ should ensure that her hypothetical questions to the VE incorporate all recognized impairments and limitations before she relies on the VE's testimony in her step-five determination.

preceding the hearing. (*Id.* at 9.) Third, he says that the ALJ should have ordered medical records from the facility where Ford had been incarcerated in 2008 and 2009. (*Id.*)

As the claimant, Ford has the burden to prove his disability. *See, e.g.*, *Hill v. Sullivan*, 924 F.2d 972, 974 (10th Cir. 1991). "However, unlike the typical judicial proceeding, a social security disability hearing is nonadversarial, with the ALJ responsible in every case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) (internal citations and quotation marks omitted); *see also* SSR 96-7p, 1996 WL 374186, at *2 n.3 (July 2, 1996). Although the ALJ is ordinarily entitled to rely on a claimant's representative to adequately present the claimant's case, *Hawkins*, 113 F.3d at 1167, "[a]n ALJ has the duty to . . . obtain[] pertinent, available medical records which come to [her] attention during the course of the hearing," *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996). Despite this duty, "[t]he ALJ does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning." *Hawkins*, 113 F.3d at 1168.

Ford alleges that the SSA failed to provide Dr. Ainsley, the consultative psychologist, with any background documents related to his previous mental health treatment. However, according to the transcript index, the only documents on Ford's mental health treatment available to the SSA at the time of Dr. Ainsley's January 2010 examination were those from 1998 and 2000, treatments that occurred well before Ford's onset date. (*See* A.R. at 32-35.) In fact, other than records of Ford's influenza treatment in 2009 (A.R. at 239-41), which were provided to Dr. Ainsley (A.R. at 289), the SSA did not have any post-onset medical records to give to her, since Ford had not yet submitted any such records. (*See* A.R. at 32-35.) Accordingly, there was no error on the part of the SSA for failing to provide such information.

Ford also says that the ALJ should have obtained additional records from PMS concerning his mental health treatment. Ford first mentioned that he was presently in mental health counseling at PMS when he testified at the hearing. (A.R. at 42.) At that time, his representative submitted mental health records from November 2010 showing treatment at VFSS Farmington, a PMS facility (A.R. at 39-40, 296-316), and these documents were received into the record (A.R. at 35). As such, the ALJ was entitled to presume that Ford's representative had provided adequate documentation of Ford's treatment at PMS. *See Hawkins*, 113 F.3d at 1167. Further, it is not clear that other records of this treatment are relevant or existent. After the ALJ's decision, Ford's attorney provided records to the Appeals Council from PMS covering the period from August 1999 to April 2011 (*see* A.R. at 5, 337-50), but the exhibit did not include any notes referring to mental health counseling in the months leading up to the December 2010 hearing. *Cf. Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008) (finding no grounds for remand where "neither counsel nor the claimant have obtained (or, as far as we can tell, tried to obtain) for themselves the records about which they now complain"). There can be no error when an ALJ has considered pertinent evidence and the claimant has not shown that any medical evidence was disregarded. *See Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000). Consequently, I conclude that the ALJ did not commit reversible error in failing to obtain any such additional notes from PMS.

Ford also claims that the ALJ should have ordered or independently obtained records of his treatment for physical and mental health issues at the facility where he was incarcerated. After a thorough review of the record, I have determined that none of Ford's application materials, consultative examination records, or testimony at the hearing indicated that he had been treated for back or knee problems while incarcerated. In fact, just before referring to his

12

incarceration, Ford expressly testified at the hearing that he had not been treated for back pain or knee pain. (A.R. at 43-44.) Accordingly, the ALJ was not on notice that there were any further records available from the incarcerating facility related to Ford's physical impairments.

However, Ford did testify that he was being treated and receiving medication for his mental health conditions while incarcerated. (A.R. at 43-44.) The acquisition of medical opinions from treating physicians is particularly important since such opinions are generally given controlling weight, *see* 20 C.F.R. § 404.1527(c)(2), so the mention of this treatment should have alerted the ALJ that further development of the record was necessary, *see Carter*, 73 F.3d at 1022. This duty was not obviated by the fact that Ford was represented at the hearing. *See Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993).[5] The ALJ's failure to acquire these treatment records under these circumstances amounts to reversible error, and I must therefore remand. Since the relevant records were submitted to the SSA on appeal (A.R. at 337-50), I instruct the ALJ to consider these records in reaching her disability determination on remand.

On the record before me, it does not seem likely that further development of the record would affect the ALJ's conclusions regarding the first two steps of the sequential evaluation process. However, because at this point it is unclear which (if any) of the remaining steps would be affected by further development, I proceed to consider Ford's additional claims of error at those remaining steps.

---

[5] Ford argues that the ALJ's duty toward him was heightened due to the quality of representation he received at the hearing. (Doc. 19 at 9.) Although Ford makes much of the fact that Boushee is not an attorney (Doc. 22 at 1), representatives at SSA hearings do not need to be attorneys, 20 C.F.R. § 416.1505(b). Ford contends that the ALJ has a heightened duty "[w]hen a claimant is not represented by an attorney," but the caselaw he cites only deals with claimants who are unrepresented. (*See* Doc. 22 at 1.) Nonetheless, I do not need to decide whether the ALJ's duty toward Ford was heightened in this case, as the ALJ had a duty to further develop the record here regardless of Ford's representation status.

## II.     Failure to Obtain Medical Care

In her decision, the ALJ points out that Ford has failed to obtain indigent medical care for his mental health issues despite his insistence that he needs treatment. (A.R. at 28.) Ford argues that this reliance on his alleged failure to seek treatment is erroneous. First, he alleges that the ALJ improperly concluded from this failure to obtain treatment that his "complaints of disabling symptoms are not especially bothersome," since the ALJ did not show that there are free medical facilities in his hometown and did not consider whether he could afford low-cost treatment. (Doc. 19 at 10.) However, the Tenth Circuit has previously held that the claimant has the burden of showing that he sought medical treatment but was refused for an inability to pay. *See Allen v. Apfel*, No. 99-3249, 216 F.3d 1086, at *3 (10th Cir. June 21, 2000) (unpublished table decision) (citing *Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992)). Here, Ford has not shown that he sought free or low-cost medical treatment or that he was refused such care due to a lack of funds. As such, it was appropriate for the ALJ to consider Ford's failure to seek available treatment in evaluating his credibility. *See Quall v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000).

In a similar vein, Ford insists that the ALJ should have discussed certain factors when she relied on Ford's failure to seek treatment. (*See* Doc. 19 at 14.) When denying benefits because a claimant failed to follow a treatment regimen, the ALJ must engage in a four-factor analysis. *See Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987). However, the ALJ need not engage in the *Frey* analysis when she is merely discussing a failure to seek treatment in order to determine the claimant's credibility. *See Quall*, 206 F.3d at 1372-73 (citations omitted). Here, the ALJ analyzed this matter to determine the credibility of Ford's statements regarding the severity of his impairment, not in denying benefits because he failed to follow treatment. (*See* A.R. at 25 (stating the ALJ's intention to make credibility findings if the objective medical evidence did not

substantiate claims about the severity of an impairment); A.R. at 27-28 (analyzing the objective medical evidence before discussing Ford's subjective impairment claims).) Thus, the *Frey* analysis was unnecessary here, and the ALJ did not err.

Finally, Ford says that the credibility determination itself was flawed because it relied on his failure to seek free or low-cost treatment when there was no evidence that such treatment was available. (Doc. 19 at 13.) As noted *supra*, the burden to establish that indigent treatment was sought but denied rests on the claimant. *See Allen*, No. 99-3249, 216 F.3d 1086, at *3. Further, the ALJ based her credibility determination on additional factors, such as the discrepancy between Ford's claimed disability and his descriptions of his everyday activities. (A.R. 26-28.) Since substantial evidence supported the ALJ's credibility findings, there was no error.

### III. Consideration of Agency and Medical Evidence

#### A. Agency Report

Ford argues that the ALJ erred by failing to adopt all of Dr. Morrison's severity ratings during step three of the sequential evaluation process. Dr. Morrison concluded that Ford possessed moderate functional limitations in social functioning and maintaining concentration, persistence, or pace ("CPP"). (A.R. at 266.) Although the ALJ ultimately adopted Dr. Morrison's opinions as to Ford's ability to perform in a work setting, the ALJ found that Ford possessed marked difficulties in social functioning and only mild difficulties in maintaining CPP. (A.R. at 24, 28.)[6]

---

[6] Ford states that the ALJ made this alleged error at the second step of the sequential evaluation process. (Doc. 19 at 10.) However, the ALJ reached this finding in the context of determining whether Ford's mental impairments were equivalent to a condition listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12, a step-three consideration. *See* BLOCH ON SOCIAL SECURITY §§ 3.7, 3.12 (2011). She also repeated this finding, along with more detailed factors, in assessing Ford's RFC, a step-four consideration. (A.R. at 28.)

For the SSA to conclusively presume that a claimant is disabled at step three, his severe impairments must meet or be medically equivalent to a condition listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The severe impairments that the ALJ found Ford to possess may satisfy this step-three analysis if Ford is found to have marked difficulties in at least two of the four functional limitations listed in Paragraph B of the relevant sections of that Appendix. *See id.* §§ 12.04, .06, .08. Here, Dr. Morrison found that Ford did not have marked difficulty in any of the four functional limitations (A.R. at 266), and the ALJ found that Ford had marked difficulty in only one of these limitations (A.R. at 24). Even if the ALJ had agreed with Dr. Morrison's assessment of moderate CPP difficulties at the third step, Ford still would not satisfy a listing-level condition. Therefore, even if the ALJ had erred in failing to adopt Dr. Morrison's severity ratings, I find that any such error would be harmless and could not serve as grounds for remand. 20 C.F.R. § 498.224; *see also Barber v. Astrue*, 431 F. App'x 709, 713 (10th Cir. 2011) (unpublished).

Ford also argues that the ALJ erred in failing to discuss any of Dr. Morrison's more detailed severity ratings when evaluating Ford's RFC at step four. (*See* Doc. 19 at 11-12; A.R. at 270-71.) For support, Ford points to *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007), where the Tenth Circuit held that an ALJ erred in accepting some of the moderate limitations found by a non-examining physician while rejecting others without discussion. (*See* Doc. 22 at 2.) However, in that case, "the ALJ's RFC determination reflected restrictions consistent with some of the moderate limitations [found by the physician], but not with all of them." *Frantz*, 509 F.3d at 1303. By contrast, Ford does not identify any ways in which the ALJ's RFC fails to reflect the restrictions found by Dr. Morrison, and no such differences are apparent from the ALJ's decision. While the ALJ must cite specific medical facts and nonmedical evidence in

16

describing how she reached her RFC, *see* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996), she does not need to describe every piece of evidence she relies upon, *see Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Ford's argument is further undercut by the fact that the ALJ expressly concurred with and ultimately adopted Dr. Morrison's opinions and conclusions with respect to this RFC. *See Barber*, 431 F. App'x at 712-13 ("When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." (quoting *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004))). Accordingly, the ALJ did not err in not discussing Dr. Morrison's findings in more detail.

    B.  *Medical Records*

Ford also argues that the ALJ erred in failing to discuss certain medical records or findings, including records of several emergency room visits and diagnoses by Dr. Ainsley. Despite the Commissioner's implication to the contrary (Doc. 21 at 3), an ALJ's statement that she considered "all the evidence" is not by itself sufficient. *See Salazar v. Barnhart*, 468 F.3d 615, 622 (10th Cir. 2006). It is true that the ALJ does not need to discuss every piece of evidence in her decision. *Wall*, 561 F.3d at 1067 (citation omitted). However, if there is significantly probative medical evidence in the record that does not support her decision, the ALJ must discuss the evidence and her reasons for rejecting it. *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) (citing *Clifton*, 79 F.3d at 1009-10).

Ford argues that the ALJ should have discussed certain opinions from Dr. Ainsley's report and explained why she did not adopt them. However, as the Commissioner notes in his response, Ford misreads the ALJ's decision; "the ALJ specifically set forth Dr. Ainsley's statement verbatim" and incorporated these opinions into her decision. (Doc. 21 at 9. *Compare* A.R. at 290-91 (Dr. Ainsley's conclusions), *with* A.R. at 27 (the ALJ's conclusions).) The only

other portion of Dr. Ainsley's disability assessment that Ford thinks the ALJ should have addressed is his GAF, a factor that the ALJ is not required to discuss. *See Zachary v. Barnhart*, 94 F. App'x 817, 819 (10th Cir. 2004) (unpublished) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). Therefore, the ALJ did not err in her treatment of Dr. Ainsley's assessment.

Ford also alleges error with respect to the ALJ's failure to mention evidence of his 2010 emergency room visits, saying that these records are relevant to his testimony regarding chronic back pain. (Doc. 19 at 9.) Ford was diagnosed with a urinary tract infection at his October 2010 emergency room visit (A.R. at 320), a diagnosis that has no apparent bearing on his claims of chronic back pain. However, Ford was diagnosed with a strained back in July 2010 (A.R. at 327), and he was apparently diagnosed with a strained back again on some other unspecified dates (A.R. at 329, 333). These diagnoses are significantly probative medical evidence that do not support the ALJ's conclusion that Ford does not have a chronic back condition, and as such they should have been discussed by the ALJ. *See Clifton*, 79 F.3d at 1010. Therefore, the case must be remanded so that the ALJ may expressly consider Ford's claims of chronic back pain in light of these hospital visits, Dr. Burger's examination, and the other significantly probative evidence in the record.

## CONCLUSION

The ALJ erred in her review of Ford's applications for DIB and SSI payments. While she reached appropriate credibility determinations, she failed to properly develop the record or to consider significantly probative medical evidence that did not support her decision. Accordingly, I grant Ford's motion to reverse, and I remand this case back to the SSA for proceedings consistent with this opinion.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.